NOT DESIGNATED FOR PUBLICATION

No. 117,430

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

COREY LYNN STANSBURY,
*Appellant*.


MEMORANDUM OPINION

Appeal from Ford District Court; VAN Z. HAMPTON, judge. Opinion filed April 6, 2018. Affirmed.

*Kai Tate Mann*, of Kansas Appellate Defender Office, for appellant.

*Jodi Litfin*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.


Before BRUNS, P.J., PIERRON and POWELL, JJ.


PER CURIAM:  Corey Lynn Stansbury appeals after a jury found him guilty of aggravated battery. On appeal, Stansbury contends that the district court erred in failing to instruct the jury on reckless aggravated battery as a lesser included offense. However, we do not find that the facts support the giving of that instruction. Stansbury also argues that the jury was prevented from exercising its inherent power of nullification because of a statement made by the prosecutor during closing arguments and based on the language of the jury instructions. We find neither argument to be persuasive. Thus, we affirm.

1

FACTS

On the evening of December 26, 2014, Terry Arntt went to a bar with some friends. Kalya Tepe picked Arntt up at the bar, and they went to another bar. At some point, Tepe went to the restroom while Arntt went to the bar to order another drink. According to Arntt, when he turned away from the bar, Stansbury was standing right behind him. Evidently, the two briefly exchanged words before Stansbury punched Arntt in the mouth. As a result, Arntt's upper jaw was broken and his teeth were displaced. Subsequently, Arntt had to have surgery to repair his jaw and he lost two of his teeth.

Officers from the Dodge City Police Department located Stansbury the next day and arrested him for aggravated battery. Ultimately, the State charged Stansbury with one count of aggravated battery. The district court held a one-day jury trial on September 6, 2016.

During opening statements, Stansbury's defense counsel suggested that the evidence would show that Arntt actually fell and hit his mouth. Kayla Tepe testified that at approximately 10:30 p.m. on December 26, 2014, she went to the Game Time bar in Ford County with Arntt. Tepe testified that Arntt had two or three beers at the bar. Tepe stated that when she returned from the restroom, she could not find Arntt. One of the bartenders told her he had been hit. So Tepe followed a trail of blood leading to the men's restroom.

Tepe went inside the restroom and found Arntt with a bunch of paper towels shoved in his mouth trying to stop it from bleeding. When he removed the paper towels, she noticed that "his entire upper mandible in the front had been pushed inwards to where . . . his front teeth were, like, in the middle of his roof of his mouth." She asked Arntt what happened, and he told her Stansbury had punched him.

Evidently, someone at the bar had called 911. When the police and paramedics arrived, Arntt made a statement and was told that he needed to go to the emergency room at Western Plains Medical Complex in Dodge City. Tepe testified that she wrote the statement down for Arntt because "he has horrible handwriting. He was shaking really bad after the incident, and he wasn't able to do it himself, so I wrote it out for him using exactly his words."

After finishing the police report, Tepe drove Arntt to the emergency room. The emergency room took x-rays and determined that Arntt's mandible had been broken. Arntt had surgery in Wichita on his mandible later that day. Tepe testified that she also took Arntt back to Wichita sometime in February to have the brackets removed that held his jaw together after surgery.

Tepe testified that before the incident, Arntt was missing one tooth and had some chipped teeth. After the incident, Arntt's upper lip had sunk in, and all of his front teeth on the top were missing. She testified that Arntt did not seem to her to be highly intoxicated on the night of the incident. Moreover, she testified that Arntt did not ever tell her that he had fallen, and she did not observe Arntt stumble at the Bar.

Dodge City Police Officer Ruben Vela testified that he was called to Game Time in the early morning hours of December 27, 2014. He met with Arntt, who told him that he got punched in the face by Corey Stansbury. Specifically, Officer Vela testified:

"[Arntt] said he had arrived at the bar and had seen [Stansbury] there. He . . . notified me of some things in the past that had happened between [Stansbury's] ex-girlfriend. He said that [Stansbury's] girlfriend, at the time, had left [Stansbury] for him. So, he went up to [Stansbury] to speak about that incident and try to put things aside. He said that he mentioned the female's name, that's whenever [Stansbury] punched him."

3

Shortly after he arrived, Officer Vela took photographs of the bar area and of Arntt's injuries. He testified that there were quite a few people at the bar when he arrived, but he did not interview any of them. He noted that Arntt smelled of alcohol when he spoke to him. He also took photographs of Stansbury's hands later that day in the afternoon.

Dodge City Police Officer Troy Buller testified that he also responded to the call from Game Time. He arrived at approximately 1:45 a.m. and spoke to Arntt, who told him that he had been punched in the mouth by Stansbury. Officer Buller also spoke to about 8 to 12 people who were still at the Bar, and no one said they saw what happened. Instead, they told the officer that they saw Arntt lying on the ground bleeding, but they did not see what had caused him to fall to the floor. Officer Buller testified that Arntt did not seem to be heavily under the influence of alcohol and that he was able to carry on a conversation. Arntt did not say he had stumbled or had been tripped. However, he believed he lost consciousness for a period of time as a result of being hit. Due to Arntt's injuries, it was difficult for Officer Buller to tell whether he was slurring his words.

Linda Foskuhl—who is Arntt's cousin—testified that sometime in December 2014, she was with her friend—Nicole Stobaugh—who lived with Stansbury. Foskuhl recalled that Stansbury came home from a bar at approximately 1 a.m. and said he had hit Arntt. She reported the statement to the police at approximately 5 a.m. that same day. She also testified that before the incident, Arntt had all of his teeth, and after the incident, he was missing teeth.

Nicole Stobaugh testified that she had a romantic relationship with Stansbury for approximately eight years, and they have two children together. Although the two continued to live together, they apparently were no longer involved in a romantic relationship. Stobaugh testified that during 2014, she and Arntt liked each other. She

4

indicated that she and Arntt would spend time with Foskuhl and Stansbury. However, according to Stobaugh, Stansbury was upset that she spent time alone with Arntt.

During the early morning hours of December 27, 2014, Stansbury came home and asked Stobaugh if she knew where Arntt was. She said she did not. Then Stansbury told her that Arntt was at the bar and that he had punched him in the face. Stobaugh was upset and told Stansbury to leave, which he did. At some later point, Stobaugh talked to Stansbury and told him how badly he had injured Arntt. According to Stobaugh, Stansbury responded with, "Just remember, that was with one hit."

Arntt testified that he had known Stansbury for approximately 10 years. He also testified that he and Stobaugh had a relationship during 2014. Although Arntt and Stansbury were pretty good friends prior to that time, Stansbury began getting angry with Arntt because he was seeing Stobaugh. Arntt testified that on December 26, 2014, he went to a bar around 11:30 p.m. to meet some friends, including Andrew Smith, and had one beer. Around midnight, Tepe picked up Arntt and Smith and they went to Game Time.

Arntt testified that he had two beers at Game Time and that when he had turned around from the bar after ordering another drink, Stansbury was standing there. According to Arntt, he started to say something like "we need to" to Stansbury. But as soon as he did so, Stansbury hit him in the mouth with a closed fist. He fell to the floor, where he stayed for a few seconds and then he got back up.

Arntt testified that before December 27, 2014, he was having problems with his two front teeth—one of which was cracked—but he was not missing any teeth. He testified that he did not fall down or have any trouble keeping his balance before the incident. The prosecutor asked Arntt whether it seemed like it could have been an accident when Stansbury hit him in in the mouth, and he answered that it did not. The

5

district court admitted Arntt's medical records from Western Plains Medical Complex in Dodge City, detailing his injuries.

Arntt testified that Tepe took him to the emergency room in Dodge City, where they took x-rays and gave him pain medication. A doctor referred Arntt to an orofacial specialist in Wichita for surgery. Arntt testified that the specialist told him that his "bones were shattered like Corn Flakes, and that I needed to have surgery to save my teeth, and everything." Arntt had surgery on the same day to reconstruct his jaw and his gums. His two front teeth were removed, and the doctor placed braces on his gums to hold his other teeth in place.

According to Arntt, his mouth healed a couple of months after the incident. When asked if the incident changed his speech, he said that he had been told that he had a slur because of his missing teeth. At the time of the trial, Arntt was 33 years old. He said that he had to be on a liquid diet for a while following the surgery, but ultimately although he had difficulty chewing, he was able to eat regular food. He testified that he incurred medical expenses around $30,000 as a result of being hit in the mouth.

After the State rested, Stansbury moved for a directed verdict. The district court denied the motion, and Stansbury elected not to present any evidence at trial. During closing argument, Stansbury's defense counsel argued that Arntt likely fell and broke his teeth while intoxicated. He also argued that there was a lack of evidence presented to find his client hit Arntt. In particular, he relied upon the fact that nobody else who remained at the bar after the police arrived claimed to have seen what had happened, including Arntt's friend who was standing right next to him. Defense counsel also argued that the two witnesses who testified that Stansbury told them he hit Arntt were biased. He noted that one was Arntt's cousin and the other would greatly benefit from Stansbury going to prison because she would have custody of their children. Defense counsel asked the jury to look at the pictures of Stansbury's hands and determine if they looked like the hands of

a person who had just punched someone. He also asked the jury to look at Arntt's injuries and determine if they looked like damage resulting from a punch or from falling down and hitting his mouth on a bar table or pool table.

Ultimately, the jury found Stansbury guilty of aggravated battery for knowingly causing great bodily harm or disfigurement. On September 19, 2016, Stansbury filed a motion for judgment of acquittal or, in the alternative, a new trial. On February 1, 2017, the district court denied Stansbury's motion. The district court sentenced Stansbury to 62 months' imprisonment. Thereafter, Stansbury timely filed a notice of appeal.

ANALYSIS

*Reckless Aggravated Battery Instruction*

Stansbury contends that the district court erred in failing to instruct the jury on reckless aggravated battery as a lesser included offense of aggravated battery. There are multiple steps with different standards of review when addressing a district court's failure to give a jury instruction. First, we utilize an unlimited standard of review to determine whether the party preserved the issue. Next, we consider the merit of the claim, deciding whether error occurred below. In this step, we must determine if the instruction was legally appropriate with an unlimited standard of review and whether there was sufficient evidence, viewed in the light most favorable to the requesting party, to support the instruction. Finally, if we determine that the district court erred, we must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011). *State v. Dupree*, 304 Kan. 377, 391-92, 373 P.3d 811 (2016); *State v. Fisher*, 304 Kan. 242, 256-57, 373 P.3d 781 (2016).

It appears that Stansbury properly preserved this issue by requesting an instruction on reckless aggravated battery as a lesser included offense. See K.S.A. 2017 Supp. 22-

3414(3); *State v. Roeder*, 300 Kan. 901, 920, 336 P.3d 831 (2014). During the conference in which the parties discussed which instructions to give the jury, Stansbury requested that the jury be instructed on reckless aggravated battery. The district court determined that the evidence showed "either this was a knowing act or not an act at all, because there is no evidence given that the Defendant was acting in a way that was reckless, such as spinning around with his arms flailing when people were close by, or anything like that." Thus, the district court determined that the evidence did not justify an instruction on reckless aggravated battery.

The State maintains that we should still apply the clearly erroneous standard because Stansbury advances a different argument on appeal than he did before the district court. Nevertheless, under either theory, we must first determine whether the instruction was legally and factually appropriate. *Dupree*, 304 Kan. at 392. If we find that the requested instruction was legally and factually appropriate, then the district court's failure to give the instruction was error. *State v. Plummer*, 295 Kan. 156, 161-62, 283 P.3d 202 (2012).

Reckless aggravated battery is a legally appropriate lesser included offense of aggravated battery. *State v. McCarley*, 287 Kan. 167, 177-78, 195 P.3d 230 (2008). Although the Kansas criminal code has been revised since *McCarley*, the decision remains good law because the new statute continues to distinguish the varying levels of aggravated battery in the same manner. See K.S.A. 2017 Supp. 21-5413(g)(2); *State v. Castro*, No. 111,981, 2016 WL 97849, at *5 (Kan. App. 2016) (unpublished opinion), *rev. denied* 305 Kan. 1253 (2017). The State concedes this point.

We must next determine whether it would have been factually appropriate to instruct on reckless aggravated battery in this case. The district court shall instruct the jury on lesser included offenses where there is some evidence that would reasonably justify a conviction of the lesser included offense. K.S.A. 2017 Supp. 22-3414(3); *State v.*

8

*Armstrong*, 299 Kan. 405, 432, 324 P.3d 1052 (2014). The Kansas Supreme Court also states that the following standard applies when evaluating whether a lesser included instruction is factually appropriate in the case: "If, after a review of all the evidence viewed in the light most favorable to the prosecution, we are convinced that a rational factfinder could have found the defendant guilty of the lesser crime, failure to give the instruction is error." *Fisher*, 304 Kan. at 258.

The jury was instructed on aggravated battery under K.S.A. 2017 Supp. 21-5413(b)(1), which states that aggravated battery is: "(A) Knowingly causing great bodily harm to another person or disfigurement of another person; [or] (B) knowingly causing bodily harm to another person . . . in any manner whereby great bodily harm, disfigurement or death can be inflicted."

Stansbury claims that the evidence supports an instruction under the definition of aggravated battery in K.S.A. 2017 Supp. 21-5413(b)(2), which states that aggravated battery is: "(A) recklessly causing great bodily harm to another person or disfigurement of another person; or (B) recklessly causing bodily harm to another person with a deadly weapon, or in any manner whereby great bodily harm, disfigurement or death can be inflicted." Moreover, the Kansas criminal code defines reckless conduct as the following: "A person acts 'recklessly' or is 'reckless,' when such person consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." K.S.A. 2017 Supp. 21-5202(j).

> "To act recklessly, a defendant must know that he or she is putting others in imminent danger, *State v. Jenkins*, 272 Kan. 1366, 1375, 39 P.3d 47 (2002), but need not foresee the particular injury that results from his or her conduct. *State v. McCoy*, 34 Kan. App. 2d 185, 194, 116 P.3d 48 (2005) (citing *State v. Davidson*, 267 Kan. 667, 682-84, 987 P.2d 335 [1999]). By contrast, intentional conduct is purposeful, willful, and not accidental. K.S.A. 21-3201(b)." *State v. Gatlin*, 292 Kan. 372, 377, 253 P.3d 357 (2011).

9

In *Gatlin*, the Kansas Supreme Court reversed Gatlin's aggravated battery conviction and remanded for a new trial because the district court refused to instruct on reckless aggravated battery. 292 Kan. at 378. The facts of that case were that Gatlin got into a fight outside a bar and ended up biting another person's thumb off. The *Gatlin* court concluded that a reasonable jury instructed on the elements of reckless aggravated battery and the definition of recklessness could have concluded that Gatlin engaged in reckless conduct and did not intentionally sever the man's thumb, stating:

"He may have chosen to continue biting [the victim's] thumb to persuade [the victim] to release the chokehold, knowing that this put [the victim] in danger and yet consciously disregarding that danger; or he may have chosen to allow [the victim's] thumb to remain in his mouth as the two men struggled, knowing but consciously disregarding the danger that they would lose their balance and hit the ground." 292 Kan. at 377.

Even viewing the evidence in the light most favorable to Stansbury, there was no evidence at trial that Stansbury did anything that could be considered reckless. Instead, two scenarios were presented to the jury. On the one hand, the State relied upon Arntt's version of the events that Stansbury stood directly in front of Arntt and punched him once in the face with his fist. On the other hand, Stansbury claimed that he did not hit Arntt. Rather, he asserted that Arntt's injuries resulted from a fall rather than a punch.

The Kansas Supreme Court has found that the term "knowingly" means

"that the accused acted when he or she was aware that his or her conduct was reasonably certain to cause the result. This does not mean that the accused must have foreseen the specific harm that resulted. Instead, it is sufficient that he or she acted while knowing that any great bodily harm or disfigurement of the victim was reasonably certain to result from the action." *State v. Hobbs*, 301 Kan. 203, 211, 340 P.3d 1179 (2015).

Here, the disputed question of fact was whether Stansbury punched Arntt in the mouth or whether Arntt simply fell and injured himself. Because the jury was not

presented with evidence that Stansbury somehow recklessly injured Arntt, we find that the district court correctly determined that an instruction on reckless aggravated battery was not factually appropriate in this case. Thus, we conclude that the district court did not err in failing to instruct on reckless aggravated battery as a lesser included offense.

*Jury Nullification*

Stansbury also contends that the district court erroneously instructed the jury on the burden of proof. Specifically, Stansbury challenges the following instruction given to the jury: "If you have no reasonable doubt as to the truth of each of the claims required to be proved by the State, you should find the Defendant guilty." Although this language is taken from PIK Crim. 4th 51.010, Stansbury maintains that if the instruction had used the word "may" in place of the word "should," it would have ensured that the jury understood that it had a right to nullify.

Because Stansbury did not object to this instruction at trial, we review the instruction to determine whether it was "clearly erroneous." K.S.A. 2017 Supp. 22-3414(3). To do so, we use a two-step process to decide whether a challenged instruction was clearly erroneous. First, we must determine whether there was any error at all by considering whether the subject instruction was legally and factually appropriate. We have unlimited review when determining the legality of this instruction. *State v. Smyser*, 297 Kan. 199, 203-04, 299 P.3d 309 (2013). Second, if we find error, we must assess whether we are firmly convinced that the jury would have reached a different verdict without the error. As the party claiming error in the instructions, Stansbury bears the burden of proving the degree of prejudice necessary for reversal. See *State v. Betancourt*, 299 Kan. 131, 135, 322 P.3d 353 (2014).

Jury nullification occurs when a jury knowingly renders a verdict contrary to the evidence or the law. It is defined as

11

"'[a] jury's knowing and deliberate rejection of the evidence or refusal to apply the law either because the jury wants to send a message about some social issue that is larger than the case itself or because the result dictated by law is contrary to the jury's sense of justice, morality, or fairness.' Black's Law Dictionary 875 (8th ed. 2004)." *Silvers v. State*, 38 Kan. App. 2d 886, 888, 173 P.3d 1167 (2008).

The Kansas Supreme Court has expressly disapproved of jury nullification instructions. In *State v. McClanahan*, 212 Kan. 208, 217, 510 P.2d 153 (1973), the court stated:

"Although it must be conceded that the jurors in a criminal case have the raw physical power to disregard both the rules of law and the evidence in order to acquit a defendant, it is the proper function and duty of a jury to accept the rules of law given to it in the instructions by the court, apply those rules of law in determining what facts are proven and render a verdict based thereon."

Moreover, in *State v. Naputi*, 293 Kan. 55, 65-66, 260 P.3d 86 (2011), the Kansas Supreme Court affirmed the district court's decision to decline to modify the jury instruction on burden of proof to reflect the jury's power of nullification. The court stated that "[j]uries possess the power to decide a case in a manner which is contrary to the applicable facts and law, *i.e.*, the power of jury nullification. However, a defendant is not entitled to have the jury instructed on the power of nullification." 293 Kan. 55, Syl. ¶ 4. The *Naputi* court ruled: "It is not the role of the jury to rewrite clearly intended legislation, nor is it the role of the courts to instruct the jury that it may ignore the rule of law, no matter how draconian it might be." 293 Kan. at 66.

Stansbury is not arguing that a jury nullification instruction should have been given. Instead, he contends that the reasonable doubt instruction that the district court gave foreclosed any opportunity the jury may have had to exercise its power of jury

nullification. Moreover, he attempts to equate the jury instruction given in his case with the instruction struck down in *State v. Smith-Parker*, 301 Kan. 132, 340 P.3d 485 (2014).

Stansbury argues that "should" is a synonym for "must." He argues that the word "should" is just a past tense version of "shall," which he claims is a command or an indication that something is mandatory. This court has rejected an identical argument, finding it to be "undercut by multiple decisions of our Supreme Court." *State v. Bostic*, No. 115,114, 2017 WL 1382603, at *5 (Kan. App. 2017) (unpublished opinion), *rev. denied* 307 Kan. ___ (November 9, 2017). In addition, this court has noted that the word "should" is not the past tense of "shall" but "simply reflects a lesser degree of duty than 'shall.'" *State v. Hernandez-Cartagena*, No. 113,862, 2017 WL 3827628, at *4 (Kan. App. 2017) (unpublished opinion), *petition for rev. filed* October 2, 2017.

Similarly, in *State v. Allen*, 52 Kan. App. 2d 729, 372 P.3d 432 (2016), *rev. denied* 306 Kan. 1320 (2017), this court considered the same argument advanced by Stansbury. Applying the holding from *Smith-Parker*, the *Allen* court upheld a jury instruction identical to the one given in this case—which is identical to the one suggested in PIK Crim. 4th 51.010. The panel noted that "'unlike the words must, shall, and will, the word should does not express a mandatory, unyielding duty or obligation; instead, it merely denotes the proper course of action and encourages following the advised path.' [Citation omitted.]" 52 Kan. App. 2d at 735. See *State v. Jacobs*, No. 115,061, 2017 WL 3837212, at *6 (Kan. App. 2017), *rev. denied* 307 Kan. ___ (February 27, 2018); *State v. Cuellar*, No. 112,535, 2016 WL 1614037, at *1-2 (Kan. App. 2016) (unpublished opinion), *rev. denied* 306 Kan. 1322 (2017); *State v. Hastings*, No. 112,222, 2016 WL 852857, at *4-5 (Kan. App. 2016) (unpublished opinion), *rev. denied* 306 Kan. 1324 (2017); *State v. Singleton*, No. 112,997, 2016 WL 368083, at *4-6 (Kan. App. 2016) (unpublished opinion), *rev. denied* 305 Kan. 1257 (2016); *State v. Jones*, No. 111,386, 2015 WL 4716235, at *5-6 (Kan. App. 2015) (unpublished opinion), *rev. denied* 303 Kan. 1080 (2016).

In conclusion, we find that the reasonable doubt instruction given in this case was taken from the standard jury instructions that district courts are encouraged to use. See PIK Crim. 4th 51.010; *Allen*, 52 Kan. App. 2d at 733-34. Furthermore, we find that the instruction does not forbid a jury from exercising its inherent nullification power. Accordingly, we conclude that the instruction was legally appropriate and that it was not clearly erroneous. See *Betancourt*, 299 Kan. at 135 (stating that only if the instruction was erroneous does the court determine whether it is firmly convinced that the jury would have reached a different verdict without the error).

*Prosecutorial Error*

Finally, Stansbury contends that the prosecutor committed error in comments he made during closing arguments. We apply a two-part test for evaluating assertions of prosecutorial error, first determining whether the comments were improper and then deciding whether any improper comments undermined the defendant's right to a fair trial.

> "To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman* [*v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)]. In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.' *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012)." *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

During his rebuttal closing argument, the prosecutor stated: "If you do find that the State has met its burden to prove the Defendant guilty beyond a reasonable doubt, the instructions inform you that you are to return a guilty verdict." Stansbury argues that this statement was legally erroneous because it does not protect the jury's right to nullification. According to Stansbury, the prosecutor's statement is the same as the jury instruction found to be legally erroneous in *Smith-Parker*, which stated: "'If you do not have a reasonable doubt from all the evidence that the State has proven murder in the first degree on either or both theories, then you will enter a verdict of guilty.'" 301 Kan. at 163.

Based on our review of the record, we do not find that the prosecutor used words determined by our Supreme Court to "fly too close to the sun of directing a verdict for the State." 301 Kan. at 164. Likewise, we find that considering the wide latitude prosecutors are allowed in closing argument, the prosecutor's vague statement did not misstate the law. See *Hernandez-Cartagena*, 2017 WL 3827628, at \*5; *State v. Spalding*, No. 114,561, 2017 WL 1433513, at \*6-7 (Kan. App.) (unpublished opinion) (holding that prosecutor did not err by urging jurors, during voir dire, to follow the law), *rev. denied* 307 Kan. ___ (November 6, 2017). Because we find no error, we do not need to move on to the second step of the prosecutorial error analysis. See *State v. Stevenson*, 297 Kan. 49, 54-55, 298 P.3d 303 (2013) (finding no error and declining to analyze second step).

Affirmed.